McAdam, C. J.
Crime would be more speedily checked if it were not for the facility with which professional criminals furnish responsible bail. How they do, it seems a mystery, for it is difficult to understand why two respectable people who would decline to have a business transaction with a criminal, who would not trust him with a dollars’ worth of goods or a reasonable loan of money, will with little hesitation and slight coaxing execute a bond in $2,500 for the criminal’s appearance when wanted in court to stand trial for a crime on which he is already under arrest, yet the defendants did this very thing, and think it hard that they should be called upon now to pay $500 for securing a return of the criminal to justice, and a release from their obligation. The lesson, even at this price is a cheap one, and the expense serves to make it practical.
The services rendered, (when paid for) saved the defendants $2,000, and they should feel grateful at being relieved from the larger obligation, and feel pleased at being called upon to discharge the smaller one instead.
People must be made to understand that bonds and obligations given in courts of justice, are matters of substance, not of form, that when onced signed they must be literally performed or the penalty of the bond made good by the payment over of so much lawful money.
The services performed by the plaintiff, including his expenses, were reasonably worth $500, the sum charged and agreed to be paid. They were indeed valuable to the defendants. They also enabled the government to punish a swindler by imprisonment in a place where he cannot ply his pernicious vocation, and where the unwary cannot be gulled by his arts and wiles. The instrument signed by the defendants authoriziny the capture, proves an employ ment of the plaintiff by the defendants; the payment of thirty-five dollars by Schwend and $195 by Fuchius shows. that they were to pay something for the services.
This certainly contradicts the theory of Schwend that he was to pay nothing. There is no evidence in the case that the government paid anything, or intended to pay anything. In fact, the evidence proves the contrary. The goverment was apparently content with the collection of the $2,500 bond, leaving the recapture of the fugitive to the chances of time and good fortune. But spurred on by the promised $5u0, a ceaseless vigilence was kept up by the. plaintiff and his assistants, which, after the expenditure of considerable money, was rewarded by the fugitive’s capture, return and subsequent punishment.
The acts of the -plaintiff were not performed mrtute officii, but as an individual. No bench warrant had been issued for the capture of the fugitive. The plaintiff acted *715 under a special authorization from the bail to execute for them the right of recapturing their delinquent principal. Barbour, in his work on Criminal Law (p. 505), says: “A party who is thus bailed is still, in supposition of law, in custody of his sureties, who are considered as his keepers, and may, therefore, re-seize to bring him in if they fear his escape, and take him before the justice or court' to be committed, and thus the bail may be discharged from their recognizance.”
The recapture was made by virtue of the power which resided in the defendants as bail, and they in turn delegated this to the. plaintiff by the instrument they executed. The obligation was not exacted by the plaintiff colore officii. but was executed by the defendants voluntarily. It is, therefore, a valid obligation. Upon the entire case, the plaintiff is entitled to judgment for $270, the balance of the promised reward.